792 So.2d 851 (2001)
Dr. Klaus MEYHOEFFER, Plaintiff-Appellant,
v.
Daniel E. WALLACE and Winnsboro State Bank and Trust Co., Defendants-Appellees.
No. 35,025-CA.
Court of Appeal of Louisiana, Second Circuit.
July 11, 2001.
*852 Theo J. Coenen, III, Rayville, Counsel for Appellant.
Ann B. McIntyre, Winnsboro, Counsel for Appellee, Winnsboro State Bank & Trust Co., Inc.
Daniel E. Wallace, In Proper Person.
Before STEWART, CARAWAY and PEATROSS, JJ.
PEATROSS, J.
This appeal arises out of a dispute over the proceeds from the sale of crops grown in 1998 by farmer David Wallace on farm land located in Franklin Parish that Mr. Wallace leased from Dr. Klaus Meyhoeffer. Winnsboro State Bank & Trust Co., Inc. ("the Bank") had a security interest in the crops and crop proceeds granted to it by Mr. Wallace, under which it took possession of the entire 1998 crop proceeds. *853 Dr. Meyhoeffer filed suit against Mr. Wallace and the Bank asserting his lessor's privilege and seeking the 1998 rental payment. The case was submitted on stipulated facts and the trial court held that the Bank's perfected security interest in the crop proceeds was superior to Mr. Meyhoeffer's lessor's privilege. Mr. Meyhoeffer's suit was, therefore, dismissed and he now appeals. For the reasons stated herein, we affirm.

FACTS
On January 27, 1993, David Wallace leased 530 acres of farm land in Franklin Parish from Dr. Klaus Meyhoeffer. The lease agreement stated the annual rental as "one-fifth (1/5th) of the [annual] crop or $32,000.00, whichever is greater." The lease was recorded in the conveyance records of Franklin Parish on January 31, 1995. In 1998, Mr. Wallace obtained a loan from the Bank, for which he granted a security interest in the crops and crop proceeds of the leased farm land. The Bank perfected its security interest by filing a financing statement (UCC 1F) in the Louisiana Agricultural Central Registry ("LACR"), as required by La. R.S. 3:3654.[1] A UCC search revealed security interests in the crops (and proceeds therefrom), and various equipment belonging to Mr. Wallace, beginning with filings dated February 28, 1995, and continuing through February 17, 1998. The lease from Dr. Meyhoeffer was not filed in the LACR. When Mr. Wallace could not meet his obligation to the Bank and pay rent to Dr. Meyhoeffer in 1998, the Bank took possession of the proceeds from the 1998 crops and applied them to Mr. Wallace's debt.

ACTION OF THE TRIAL COURT
Dr. Meyhoeffer sued for 1998 rentals in the amount of $32,000, arguing that his lessor's privilege was superior to the Bank's security interest. The trial court disagreed and held that, since the Bank had taken the necessary steps to perfect its security interest in the crops and crop proceeds where Dr. Meyhoeffer had not (he did not file a financing statement or the lease in the LACRonly in the conveyance records of Franklin Parish), the Bank's interest in the property outranked Dr. Meyhoeffer's interest. Specifically, the trial court concluded that Dr. Meyhoeffer did not avail himself of the protection of La. R.S. 9:4521, which provides that the lessor's privilege outranks a perfected security interest only when the lessor's privilege is properly filed and maintained in accordance with the central registry provisions of La. R.S. 3:3651, et seq. As such, the trial court concluded that the Bank's perfected security interest outranked Dr. Meyhoeffer's lessor's privilege; and he was not, therefore, entitled to collect the rent for 1998 from the crop proceeds.

DISCUSSION
At the outset, we note that, in his petition, Dr. Meyhoeffer asserted a lessor's privilege on the "crops produced," and the proceeds therefrom, to secure payment of the rent. He further alleged that the Bank had constructive notice of the privilege and, therefore, should not have taken possession of the entire proceeds from the 1998 crops and should not have applied the entire crop proceeds to Mr. Wallace's loan. Nowhere in his petition did Dr. Meyhoeffer assert ownership of any portion or share of the crops or their proceeds.
*854 After the trial court's ruling regarding the ranking of the interests, however, Dr. Meyhoeffer changed his argument for purposes of appeal, now asserting ownership of 1/5th of the crops under the lease. According to Dr. Meyhoeffer, since he retained ownership of 1/5th of the crops, Mr. Wallace did not have the authority to encumber this portion by granting a security interest in the same to the Bank and the Bank's retention of the proceeds from "his" 1/5th of the crops was improper. We acknowledge that this argument may have merit under certain circumstances; however, under the facts of this particular case and the terms of this particular lease agreement, as executed by the parties, we find Dr. Meyhoeffer's argument is without merit.

The lease
After careful examination of the lease, we conclude that Dr. Meyhoeffer did not retain ownership of 1/5th of the crops under the terms of the lease. First, the lease is the standard form Farmers Home Administration's ("FmHA") "Crop-Share Farm Lease." The standard provisions of the form lease seem to contemplate joint ownership of crops between lessor and lessee, as evidenced by sections B(7) and (8), which provide space for the parties to add agreements as to the buying and selling of "jointly owned property" and provide for the division of such jointly owned property on termination of the lease. The form lease also provides space for the parties to define the "place of sale or delivery" of a portion of the crops due lessor as rent under section D(1), regarding the sharing of costs and returns and, specifically, defining rental rates. It is not, however, the blank standard form lease we are called upon to examine.
In this case, we find that the parties intended for the rental on the farm land to be a cash sum rather than the physical "delivery" of 1/5th of the crops to Dr. Meyhoeffer as rent. We draw this conclusion from several provisions of the lease. First, in section B(7), which provides for the buying and selling of "jointly owned property," the parties have written in that "[t]enant sell at his choice." Second, in section B(8), regarding the division of jointly owned property on termination of the lease, the parties have written in "N/A," indicating that this section is not applicable to the parties' intentions or agreement. Third, in section D(1), where the rental rate is specified, the parties failed to provide a "place for sale or delivery" of any portion of the crops to the lessor, which indicates that the lessor did not intend to own or to ever take possession of any part of the crops. Finally, the rental rate itself states that the "[r]ent due after [h]arvest 1/5th (sic) or $32,000 whichever greatest." We believe that it was only "after harvest" that the lessee was obligated to pay rent and that, after the lessee exercised its right to harvest and after the crops were sold by lessee, the lessor was left with a claim for cash rent specified in the lease. Stated another way, we find that this agreement reveals that the parties intended that there be a cash payment to Dr. Meyhoeffer of at least $32,000 per year, to be made after the fall's harvest. In the event that 1/5th of the crop proceeds exceeded $32,000, Dr. Meyhoeffer was entitled to a cash payment of the value of 1/5th of the crop proceeds. If 1/5th of the crop proceeds was less than $32,000, Dr. Meyhoeffer was still entitled to $32,000 cash payment as rent. In this regard, we also find telling that, in his original petition, Dr. Meyhoeffer characterized the rental agreement between him and Mr. Wallace as follows:
Under the terms of said lease, [Dr. Meyhoeffer] was entitled to rent in the amount of $32,000 at the very least, and *855 in a greater amount if one-fifth (1/5) of the crops produced on the leased premises exceeded $32,000.
No provision of this lease contemplates physical possession or ownership of 1/5th of the crops by Dr. Meyhoeffer; and, according to the allegation in his petition, he intended to always receive a cash rent payment. Moreover, the practice of the parties supports this conclusion as well. Since the inception of this lease arrangement between Mr. Wallace and Dr. Meyhoeffer, the practice was that Mr. Wallace would sell the entirety of the crops (which the lease specifically authorizes him to do) and would then pay Dr. Meyhoeffer cash rent.
Dr. Meyhoeffer relies on three sources for support of his position that he retained ownership of 1/5th of the crops: section F(7)(b) of the lease; La. R.S. 9:3204; and Guaranty Bank and Trust Company of Alexandria v. Daniels, 399 So.2d 790 (La. App. 3d Cir.1981). First, section F(7)(b) of the lease provides as follows:
Landlord subordination.In consideration of loan(s) to be made by the Farmers Home Administration (FmHA) the landlord hereby subordinates in favor of the FmHA any lien the landlord now has or may acquire in or on: ... (b) the crops, livestock increase and livestock products of the tenant (except a lien on such property produced in any year for that year's rent);....(Emphasis ours.)
Dr. Meyhoeffer argues that this provision, in which the lessor refuses to subordinate his lien on crop proceeds produced for rent, indicates that the lessee does not have the right to encumber that portion of the crops or proceeds. The fatal flaw in this logic, however, is that, if the lessor retains ownership of 1/5th of the crops, then the lessor would not have a lien on the crops to subordinatehe would own them. It is axiomatic that one does not have a lien on something one owns. To the contrary, we read this provision to apply to cases such as this, where the lessor does not retain ownership of the crops, but, rather, has a lien on the proceeds for the payment of rent. In this particular case, the lessor was not the only party with a security interest in the proceeds, hence, the ranking issue, which will be addressed later in this opinion. In summary, we find no support for Dr. Meyhoeffer's position in section F(7), or any other section, of this lease.
Second, in light of our conclusion regarding ownership of the crops, we find La. R.S. 9:3204 inapplicable to this case. That statute provides:
3204. Lessor's part of crop considered his property; disposition penalty.
In a lease of land for part of the crop, that part which the lessor is to receive is considered at all times the property of the lessor.
The lessee or any person acting with his consent who sells or disposes of the part of the crop belonging to the lessor shall be fined not more than one thousand dollars, or imprisoned for not more than one year, or both.
By its terms, 9:3204 applies to leases wherein a part of the crop is to be "received" by the lessor. As discussed above, the lease in the case sub judice, does not so provide, nor has such been the practice of the parties. We find, therefore, that the protection of 9:3204 is not available to Dr. Meyhoeffer.
We reach a similar conclusion regarding Dr. Meyhoeffer's reliance on Guaranty Bank v. Daniels, supra. In that case, the bank sued the tenant farmer under certain promissory notes secured by a pledge of crops. The landowners intervened and the court ultimately found that the tenant farmer did not have authority to pledge *856 the crops because the lease made it clear that the landowners retained ownership of a portion of the crops. The rental rate under the lease read as follows: "LESSEE agrees to pay LESSOR a total rental of Twenty-five (25%) of all the crop or $150,000 whichever is more." Significantly, however, the lease in Guaranty Bank v. Daniels also had other provisions which indicated the landowners' retention of ownership, such as an agreement that the lessee could not in any way encumber or place a crop lien on the 25% of the "crop due LESSOR" and that lessor could sell his 25% at any time. As previously discussed, there are no similar provisions in the lease before us; and, therefore, we find Guaranty Bank v. Daniels to be clearly distinguishable from the present case.
As such, we find that Mr. Wallace owned all of 1998 crops and had the authority to sell and/or encumber all of the crops. We have already noted that the lease expressly gave Mr. Wallace the authority to sell the crops, as was his practice for all previous crop years. Further authority is found in the civil code in La. C.C. art. 474, Movables by anticipation, which provides as follows:
Unharvested crops and ungathered fruit of trees are movables by anticipation when they belong to a person other than the landowner. When encumbered with security rights of third persons, they are movables by anticipation insofar as the creditor is concerned.
The landowner may, by act translative of ownership or by pledge, mobilize by anticipation unharvested crops and ungathered fruits of trees that belong to him.
Under this article, the 1998 crops were movables by anticipation which Mr. Wallace, as owner of the crops, was entitled to encumber. In addition, the crops were movables by anticipation insofar as the Bank was concerned once Mr. Wallace granted the Bank a security interest in the crops.
Notwithstanding our conclusion that Dr. Meyhoeffer did not retain ownership of 1/5th of the crops or the proceeds therefrom, we agree with him and the trial court that he did, however, enjoy a statutory lessor's privilege on the same. Our conclusions thus far, therefore, are (1) Dr. Meyhoeffer did not retain ownership of 1/5th of the crops or proceeds, but did enjoy a statutory privilege on the same and (2) Mr. Wallace had the authority to sell and encumber all of the 1998 crops. We will now address the trial court's conclusion regarding the ranking of Dr. Meyhoeffer's lessor's privilege and the Bank's perfected security interest in the crop proceeds.

Lessor's privilege and ranking of interests
The dispute in the case sub judice is over 1/5th of the cash proceeds from the sale of the 1998 crops and not the actual crops. In 1998, consistent with his usual practice, Mr. Wallace harvested and sold the crops. Thereafter, the Bank seized the proceeds of the crops and applied them to Mr. Wallace's indebtedness. La. C.C. art. 3217(3) establishes a lessor's privilege on "the crops of the year" for "[t]he rents of immovables," which clearly gave Dr. Meyhoeffer a lessor's privilege on the crops for payment of rent due. Further, La. C.C. art. 3218 elevates that privilege to a right, allowing the lessor to seize and detain the crops until the lessor is paid. Article 3218, Lessor's privilege, nature and extent, provides:
The right which the lessor has over the products of the estate, and on the movables which are found on the place leased, for his rent, is of a higher nature *857 than mere privilege. The latter is only enforced on the price arising from the sale of movables to which it applies. It does not enable the creditor to take or keep the effects themselves specially. The lessor, on the contrary may take the effects themselves and retain them until he is paid.
Louisiana law provides that the lessor must exercise his privilege while the crops are still on the lessee's premises or within 15 days after they have been removed from the premises, provided the crops still remain in the lessee's possession. La. C.C. art. 2709; Carroll v. Bancker, 43 La. Ann. 1078, 43 La. Ann. 1194, 10 So. 187 (La.1891); Bayou Pierre Farms v. Bat Farms Partners, III, 95-1669 (La.App. 3d Cir.5/29/96), 676 So.2d 643, aff'd, 96-2826 (La.5/20/97), 693 So.2d 1158. We cannot discern from the record before us the exact dates of harvest and sale of the crops or the date on which Dr. Meyhoeffer made demand for the 1998 rent. In any event, we find that, since Dr. Meyhoeffer did not assert his privilege by seizing the unharvested or harvested crops within the required 15 days, his lessor's privilege over the crops was lost.
Assuming arguendo, without specifically deciding, that Dr. Meyhoeffer enjoyed a privilege on the proceeds of the sale of the 1998 crops which survived his failure to timely assert his right of pledge and detention over the physical crops, we agree with the trial court that the only means by which Dr. Meyhoeffer could have had a viable claim for the 1998 rent was if he had complied with the filing requirements of La. R.S. 9:4521.[2] Filing would, in effect, have rendered him a secured party with a perfected security interest in the crop proceeds. See Bayou Pierre Farms v. Bat Farms Partners, III, supra. The issue presented in such situation would be whether Dr. Meyhoeffer's right in the proceeds of the crops outranked the Bank's security interest in the same.[3]
Recall that the lease was recorded in the conveyance records of Franklin Parish, but was not filed in the LACR. The Bank argues that, since it is undisputed that Dr. Meyhoeffer did not take the necessary *858 steps required for his lessor's privilege to outrank the Bank's security interest, the trial court was correct in ruling that the Bank's security interest was superior. We agree.
La. R.S. 9:4521, Rank of privileges and security interests in crops, provides as follows:
As a specific exception to R.S. 9:4770 and R.S. 10:9-201, the following statutory privileges and perfected security interests as affecting unharvested crops shall be ranked in the following order of preference, provided that such privileges and security interests have been properly filed and maintained in accordance with the central registry provisions of R.S. 3:3651 et seq.:
(1) Privilege of the laborer, the thresherman, combineman, grain drier, and the overseer.
(2) Privilege of the lessor.
(3) Perfected security interests under Chapter 9 of the Louisiana Commercial Laws in the order of filing, as provided by R.S. 3:3651 et seq.
(4) Privilege of the furnisher of supplies and of money, of the furnisher of water, and of the physician.
The statute expressly provides that the lessor's privilege is superior to a Chapter 9 security interest, "provided that such privilege... ha[s] been properly filed and maintained in accordance with the central registry provisions of R.S. 3:3651 et seq." In other words, to enjoy the superior ranking provided by 9:4521, Dr. Meyhoeffer had to have filed his lessor's privilege in the LACR; and it is undisputed that Dr. Meyhoeffer did not do so. Accord Henry v. Pioneer Sweet Potato Co., Inc., 614 So.2d 853 (La.App. 2d Cir.1993); Howard v. Stokes, 607 So.2d 868 (La.App. 2d Cir. 1992). It is also undisputed that the Bank properly perfected its security interest by so filing. Again, if Dr. Meyhoeffer retained a privilege over the proceeds in this case, we see no error in the trial court's conclusion that the Bank's perfected security interest would outrank that lessor's privilege.

CONCLUSION
For the foregoing reasons, the judgment of the trial court in favor of Daniel E. Wallace and Winnsboro State Bank & Trust Co., Inc. and dismissing Dr. Klaus Meyhoeffer's suit is affirmed. Costs are assessed to Dr. Klaus Meyhoeffer.
AFFIRMED.
NOTES
[1] La. R.S. 3:3654 was enacted in 1987 and created the central registry for security devices affecting farm products in Louisiana.
[2] In the early case of Boylston v. Jones, 153 So. 53 (La.App. 2d Cir.1934), this court held that, when a lessor consents to the removal of property subject to his lessor's lien, thus abandoning and relinquishing the right of pledge and detention, the whole lien is lost. Under the holding of Boylston, Dr. Meyhoeffer may have lost any right of pledge, privilege or lien whatsoever because he consented to the removal of the movables (the crops) to which his lessor's privilege applied by agreeing in the lease that Mr. Wallace had the authority to harvest and sell the crops. Accord Reed v. Walthers, 193 So. 253 (La.App.Orleans 1940). We also note, however, that these cases involved situations where the lessor, despite his or her knowledge that lessee had failed to pay the rent, allowed the movables to be removed from the leased premises without asserting his or her statutory right of pledge and retention. The case sub judice presents a different factual scenario, where the lessor consented to the lessee's harvesting crops with the rent becoming payable only after the harvest. Thus, the lessor did not consent to, or allow, the removal of movables subject to his lessor's lien with the knowledge that the lessee had failed to pay rent due.
[3] The Bank had a security interest in the crops and the proceeds therefrom by virtue of the security instrument executed by Mr. Wallace which expressly extended the security rights of the Bank to the sale proceeds of the crops. See also La. R.S. 10:9-203(3) which provides that, "[u]nless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by R.S. 10:9-306." La. R.S. 10:9-306(2) provides, in pertinent part, that "a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party...."